**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| GARY F. REEVES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01026-JDB-egb |
| | ) | |
| RANDY LEE, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**ORDER TO MODIFY THE DOCKET,
DISMISSING CERTAIN CLAIMS
AND
DIRECTING RESPONDENT TO FILE A SUPPLEMENTAL ANSWER
ADDRESSING THE REMAINING ISSUE**

Before the Court is the petition under 28 U.S.C. § 2254 for writ of habeas corpus by a person in state custody (the "Petition") filed by Petitioner, Gary F. Reeves, Tennessee Department of Correction ("TDOC") prisoner number 217481, who is currently an inmate at the Northeast Correctional Complex ("NECX") in Mountain City, Tennessee. (Pet., *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 1.)[1] For the reasons stated below, the Court DISMISSES Claims 2, 3 and a portion of Claim 1, and ORDERS Respondent to file a supplemental answer addressing the remainder of Claim 1.

---

[1] The Clerk of Court is **DIRECTED** to modify the docket to reflect Petitioner's current address, which was obtained from the TDOC Felony Offender Information, https://apps.tn.gov/foil-app/search.jsp, and to mail a copy of this order to Reeves at that address.

# I.      BACKGROUND

## A.      State Court Procedural History

On May 3, 2010, a grand jury in Madison County, Tennessee, returned a two-count indictment against Reeves and Saundra Peterson.  (Indictment, *State v. Reeves,* No. 10-317 (Madison Cty. Cir. Ct.), ECF No. 7-1 at PageID 64-66.)  Count 1 charged that, on or about November 4 and 5 of 2009, Reeves and Peterson obtained and/or exercised control over scrap metal with a value of at least $1,000 without the effective consent of the owner, M & M Plumbing. Count 2 charged both defendants with trespassing on the property of M & M Plumbing.

The case against Reeves was tried to a jury on September 21, 2010, which returned guilty verdicts on both counts and assessed fines of $2,000 on Count 1 and $50 on Count 2.  (Trial Tr. 176-77, *id.*, ECF No. l7-4.)  At a hearing on October 18, 2010, the trial judge sentenced Reeves to concurrent terms of twelve years on Count 1 and to thirty days on Count 2.  (Sentencing Hr'g Tr. 21-22, 26, *id.*, ECF No. 7-5.)  The sentence on Count 1 was ordered to be served as a career offender with release eligibility at sixty percent, and to run consecutive to an undischarged term of imprisonment arising from a conviction in Chester County, Tennessee, and consecutive to a six-year sentence imposed after revocation of probation.  (*Id.* at 22-23, 25.)  The trial judge also ordered Reeves to pay restitution in the amount of $3,890 plus the fines recommended by the jury. (*Id.* at 22, 25-26.)  Judgments were entered on October 26, 2010.  (J., *id.* (Count 1), ECF No. 7-1 at PageID 90; J., *id.* (Count 2), ECF No. 7-1 at PageID 91.)  The Tennessee Court of Criminal Appeals ("TCCA") affirmed.  *State v. Reeves,* No. W2010-02583-CCA-R3-CD, 2011 WL 5838959 (Tenn. Crim. App. Nov. 17, 2011), *appeal dismissed* (Tenn. Apr. 24, 2012).

Reeves did not file any collateral challenges to his convictions or sentences.

The TCCA summarized the evidence introduced at trial:

The convictions in this case relate to the taking of several items from the property of M & M Plumbing on November 4 and 5, 2009. Surveillance video from the property showed a black male and a black female loading items from the M & M Plumbing property into a small, green pickup truck. Saundra Peterson, the defendant's niece and owner of the truck, later sold the items for scrap at two different recycling businesses.

Jim Morrison, owner of M & M Plumbing,[2] testified that he and his wife viewed the surveillance video after his wife noticed that several items were missing from the business property. Mr. Morrison said that he did not recognize either of the individuals that took the items and that no one had permission to take any item from the property. The Morrisons compiled a list of the missing items along with the replacement cost for each item:

| ITEM | REPLACEMENT COST |
| --- | --- |
| Running Boards | $120.00 |
| Fuel Tank | $150.00 |
| Two Section Drive Shaft | $300.00 |
| Center Bearing | $30.00 |
| Steering Section | $150.00 |
| Brake Booster | $300.00 |
| Alternator | $135.00 |
| Fan and Motor | $850.00 |
| Steel Work Table | $650.00 |
| Valves | $500.00 |
| Miscellaneous Steel Racks | $405.00 |
| Steel Pipes | $300.00 |

Mr. Morrison testified that although the property was not fenced and bore no signage indicating that it belonged to M & M, he had placed "No Trespassing" and "Private Property" signs on the barn on the property. In addition, Mr. Morrison had mounted surveillance cameras on the barn and in some nearby trees. He said that the property could be accessed by foot from several directions but by vehicle only via the driveway.

During cross-examination, Mr. Morrison acknowledged that many of the items taken were lying on the ground and that some of them were overgrown with weeds. He stated that some of the items were located inside a truck on the property and that, although the truck was not operational at the time of the offenses,

_____

[2] The transcript reflects that this witness' last name is "Morris." (*See* Trial Tr. 5, *State v. Reeves,* No. 10-317 (Madison Cty. Cir. Ct.), ECF No. 7-1.)

he was in the process of repairing it. Mr. Morrison maintained that he did not intend to scrap the truck or any of the items taken from the property.

Linda Long, part-owner of Dudley's Recycling, testified that Saundra Peterson brought two loads of scrap metal to the business on November 5, 2009. Ms. Long said that Ms. Peterson was paid $42 for the first load, which weighed 840 pounds, and $52.80 for the second load, which weighed 1,320 pounds.

Saundra Peterson testified that the defendant, who is her uncle, asked to borrow her teal green 1993 Mazda pickup truck "to get some scraps." She did not loan him the truck because he did not have a driver's license, but she agreed to drive him after he promised to split the proceeds with her. Ms. Peterson said that the defendant told her an "old white man" had given him permission to take the items and insisted that she did not know the items belonged to M & M. She testified that the defendant directed her to property adjacent to the West Bemis Baptist Church. There, they began taking items and loading them into her truck. She said they went to the property a total of three times to obtain items to scrap. Ms. Peterson said that they took some of the items to Dudley's and some of the items to Hutcherson's for payment. She said they received at [sic] total of $215 for all the items, and she took half the money.

Ms. Peterson said that nothing on the property indicated that it or the items belonged to a business and that the items they took were not "good stuff" but rather "scraps in a ditch." Ms. Peterson testified that she thought the property belonged to the church but admitted that, in any event, she knew that the property did not belong to her or the defendant.

Janet Fuller, the defendant's girlfriend, testified on behalf of the defendant that it was Ms. Peterson who asked the defendant to help her pick up "scrap that the old white man had given her." Ms. Fuller said that Ms. Peterson's son, and not the defendant, had accompanied Ms. Peterson on a second trip to pick up scraps at the property.

*Id.* at *1-2.

### B.    Procedural History of the Petition

On January 24, 2013, Reeves filed his *pro se* Petition, accompanied by a legal memorandum and a motion seeking leave to proceed *in forma pauperis*. (Pet., *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 1; Mem. of Law in Supp. of Pet., *id.*, ECF No. 1-1; Appl. to Proceed Without Prepayment of Fees and Aff., *id.*, ECF No. 2.) The Court granted

leave to proceed *in forma pauperis* on January 25, 2013.   (Order, *id.*, ECF No. 3.)   In an order

issued on April 12, 2013, the Court directed Respondent, Jerry Lester, the Warden of the West

Tennessee State Penitentiary, to file the state-court record and a response to the Petition.   (Order,

*id.*, ECF No. 5.)[3]

On May 6, 2013, the Warden filed his answer to the Petition and most of the state-court

record.   (Answer, *Reeves v. Lee*, No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 6; Not. of

Filing, *id.*, ECF No. 7.)   On May 9, 2013, Respondent manually filed an additional trial exhibit.

(Not., *id.*, ECF No. 8.)   Reeves did not file a reply.

## II.        PETITIONER'S FEDERAL HABEAS CLAIMS

In his Petition, Reeves raises the following issues:

1.   "Whether the evidence was insufficient as a matter of law to support the
     jury verdict of guilty" (Mem. of Law in Supp. of Pet. at 2, *id.*, ECF No. 1-1;
     *see also id.* at 2-4; Pet. at 5-6, *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb
     (W.D. Tenn.), ECF No. 1);

2.   "The indictment rendered against the Petitioner was fatally defective, so as
     to deprive the trial court of jurisdiction" (Mem. of Law in Supp. of Pet. at 2,
     *id.,* ECF No. 1-1; *see also id.* at 4-5; § 2254 Pet. at 7-10, *Reeves v. Lee,* No.
     1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 1); and

3.   "The affidavit of complaint was void and defective, and wherefore [sic]
     failed to establish a probable cause determination" (Mem. of Law in Supp.
     of Pet. at 2, *id.,* ECF No. 1-1; *see also id.* at 5-7; Pet. at 10-12, *Reeves v. Lee,*
     No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 1).

## III.       THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state

custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

---

[3] The Clerk of Court is **DIRECTED** to modify the docket to substitute NECX Warden
Randy Lee for Jerry Lester as Respondent in this matter.   *See* Fed. R. Civ. P. 25(d).

Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

## A. Waiver and Procedural Default

Sections 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner must "fairly present"[4] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (per curiam) (the *Adams* holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

---

[4]For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *see Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.,* when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 732.

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 322 (1995); *Coleman*, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

"There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (internal citation omitted). Until recently, then, a

habeas petitioner could not obtain relief when a claim was barred by procedural default due to the ineffective assistance of post-conviction counsel.

In 2012, the United States Supreme Court issued its decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which recognized a narrow exception to the rule stated in *Coleman* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." *Martinez,* 132 S. Ct. at 1320. In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here. . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . ." *Id.* The requirements that must be satisfied to excuse a procedural default under *Martinez* are as follows:

> (1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim; and (4) state law *requires* that an ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (internal quotation marks omitted).

*Martinez* arose under an Arizona law that did not permit ineffective assistance claims to be raised on direct appeal. *Martinez*, 132 S. Ct. at 1313. In its subsequent decision in *Trevino*, the Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a

meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal

. . . .” *Trevino*, 133 S. Ct. at 1921. Thus, the decision in *Trevino* modified the fourth requirement

stated by *Martinez* for overcoming a procedural default. The decisions in *Martinez* and *Trevino*

apply to Tennessee prisoners. *Sutton v. Carpenter*, 745 F.3d 787, 789 (6th Cir. 2014).

### B. Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated

in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim—
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this “difficult to meet”

and “highly deferential [AEDPA] standard,” which “demands that state-court decisions be given

the benefit of the doubt.” *Pinholster*, 563 U.S. at 181.[5]

Review under § 2254(d)(1) is limited to the record before the state court that adjudicated

the claim on the merits. *Id.* at 181-82, 185. A state court's decision is “contrary to" federal law

when it “arrives at a conclusion opposite to that reached” by the Supreme Court on a question of

law or “decides a case differently than” the Supreme Court has “on a set of materially

---

[5]The AEDPA standard creates “a substantially higher threshold” for obtaining relief than a
*de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan*,
550 U.S. 465, 473 (2007).

indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).[6] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on an unreasonable determination of facts. However, in *Wood v. Allen*, 558 U.S. 290 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood*, 558 U.S. at 301. In *Rice v. Collins*, 546 U.S. 333 (2006), the Court explained that "[r]easonable minds

---

[6]The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam) (same); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same).

reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[7]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is demanding but not insatiable. Accordingly, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 324, 340 (2003)) (internal citation, quotation marks & alteration omitted). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *see Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

## IV.      ANALYSIS OF PETITIONER'S CLAIMS

### A.      The Sufficiency of the Evidence (Claim 1)

In Claim 1, Reeves argues that the evidence was insufficient to sustain his conviction for theft. (Pet. at 5-6, *Reeves v. Lee,* No. 1:13-cv-01296-JDB-egb (W.D. Tenn.), ECF No. 1; Mem. of Law in Supp. of Pet. at 2-4, *id.,* ECF No. 1-1.) The factual basis for this issue as stated by the Petitioner is as follows:

> Petitioner was convicted of theft of property, absence evidence to constitute the elements of the offense. Further no evidence of proof that the alleged victim owned the property. Yet proof was presented proving that items the Petitioner was

---

[7]In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. *Wood*, 558 U.S. at 293, 299. The Court ultimately found it unnecessary to reach that issue. *See id.* at 300, 304-05. In *Rice*, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable. *Rice*, 546 U.S. at 339.

convicted of did not even belong to the victim. Plus there existed no proof that the alleged items was worth more than five hundred dollars.

(Pet. at 5-6, *id.,* ECF No. 1; *see also* Mem. of Law in Supp. of Pet. at 2-4, *id.*, ECF No. 1-1.)

Reeves challenged the sufficiency of the evidence on direct appeal. (Br. of Appellant at PageID 416, 420-23, *State v. Reeves,* No. W2009-00583-CCA-R3-CD (Tenn. Crim. App.), ECF No. 7-7.) Specifically, Reeves argued that

> [t]he evidence proved that Ms. Peterson, not Mr. Reeves, was the only individual who sold scrap metal to Dudley's and Hutcherson. Further, the receipts produced showed that Ms. Peterson was only paid a combined total for the scrap metal of $216.00, which would make the classification of the action at most a Class A misdemeanor. The signs which read "No Trespassing" and "Keep Out" were posted on the barn itself, not on the property. The testimony presented indicated that all of the scrap metal taken was located ***outside*** the barn, not on the interior of the barn which was even corroborated by the video itself. There was nothing on the property itself which would have been any indication to Mr. Reeves that he was not to be on the property, but only an indication that he was not to go into the barn. There was nothing on the property indicating the scrap metal was anything other than trash as it was even located in a ditch, as was testified to by Ms. Peterson. Even when Ms. Peterson was told that the "stuff" they had taken was "stolen["] she was so shocked that she found the son of Mr. Morris and offered to pay him back the money she had received for the scrap metal, an allegation which was never denied by Mr. Morris. Even the question presented by the jury to the Court during deliberations regarding restitution versus serving time was a clear indication that the jury did not feel Mr. Reeves should be found guilty of such serious charges. All of this leads to the only conclusion which could be reached by a jury; that there was not sufficient evidence presented at the trial to convince a reasonable jury that Mr. Reeves was guilty of the offense of Theft of Property Over $1,000.00. At most, the evidence and the jury question show that the appropriate charge should have been Theft of Property Under $500 based on the value of the scrap metal sold to Dudley's and Hutcherson as determined by [Tennessee Code Annotated] § 39-11-106(A), (B) & (C).

(*Id.* at PageID 422-23 (internal citations omitted).)

Reeves did not exhaust that portion of Claim 1 arguing that the victim, James Morris, did not own the property in question. Because there is no longer any means to exhaust that subclaim, it ordinarily would be barred by procedural default. In his answer, Respondent did not raise the

affirmative defenses of exhaustion and procedural default as to any portion of Claim 1. (*See* Answer at 3, *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 12.)

Federal courts are authorized to raise a habeas petitioner's procedural default *sua sponte*. *Clinkscale v. Carter*, 375 F.3d 430, 436-37 (6th Cir. 2004); *see also Mason v. Brunsman*, 483 F. App'x 122, 129 (6th Cir. 2012) (raising procedural default *sua sponte* on challenge to jury instruction that was presented to state courts solely as a state-law issue), *cert. denied*, 133 S. Ct. 447 (2012). Nonetheless, where, as here, the Court proposes to decide an issue on a ground that was not previously raised, it is appropriate to give the parties a chance to respond. *See Trest v. Cain*, 522 U.S. 87, 92 (1997); *see also Day v. McDonough*, 547 U.S. 198, 209-10 (2006) (authorizing district courts to raise statute of limitations *sua sponte* but requiring that parties be given opportunity to be heard).

Therefore, Respondent is ORDERED to file a supplemental answer addressing this aspect of Claim 1 within twenty-eight days of the date of entry of this order. The supplement should address whether the issue was properly exhausted in state court. If Respondent concludes the issue was exhausted or chooses to waive that affirmative defense, the supplement should address the merits of the issue. Any reply by Petitioner to the supplemental answer should be filed within twenty-eight days of service of Respondent's supplement.

As for the portion of Claim 1 that was exhausted, the TCCA denied relief on the merits, reasoning as follows:

> In this appeal, the defendant challenges the sufficiency of the convicting evidence. We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324[] (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim.

App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person commits criminal trespass if the person enters or remains on property, or any portion of property, without the consent of the owner." Tenn. Code Ann.] § 39-14-405(a) (2006). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). Theft of property valued at $1,000 or more but less than $10,000 is a Class D felony. *Id.* § 39-14-105(3). Value is "[t]he fair market value of the property or service at the time and place of the offense; or ... [i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense." *Id.* § 39-11-106(36)(A).

Tennessee Rule of Evidence 701(b) permits the owner of personal property to testify about the value of that property, *see* Tenn. R. Evid. 701(b) ("A witness may testify to the value of the witness's own property or services."); *Reaves v. State*, 523 S.W.2d 218, 220 (Tenn. Crim. App. 1975), including the fair market value at the time of the offense or the replacement cost, *see State v. Alton Tappan*, No. W2006-00168-CCA-R3-CD (Tenn. Crim. App., Jackson, May 29, 2007), *perm. app denied* (Tenn. Aug. 20, 2007); *State v. Gene Allan Logue*, No. W1999-01795-CCA-R3-CD (Tenn. Crim. App., Jackson, Dec. 15, 2000).

Here, the evidence established that the defendant went onto the property on two occasions without the permission of the owners and stole more than $1,000 worth of metal he and Ms. Peterson later sold for scrap. Mr. Morrison testified that neither the defendant nor Ms. Peterson had permission to enter his property, which was marked with "No Trespassing" and "Private Property" signs, or to take any items from the property. Ms. Peterson testified that the defendant solicited her help in taking several items from the M & M Property to be sold for scrap. Although Ms. Peterson insisted that she did not know the property belonged to M & M, she admitted that she knew the property did not belong to her. The defendant, she said, led her to believe that he had been given permission to take the items. The two then sold the items for just over $200. The scrap value of the items has

little bearing on either the fair market value or the replacement value. Mr. Morrison testified that the replacement value of the items exceeded $3,000. The jury accredited Mr. Morrison's valuation, as was its prerogative. *See State v. Hamm*, 611 S.W.2d 826, 828-29 (Tenn. 1981) (holding that it is up to the jury to determine the value of the items stolen). Under these circumstances, the evidence was sufficient to support the defendant's convictions.

*State v. Reeves*, 2011 WL 5838959, at *2-3.

In *Jackson v. Virginia*, the United States Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324. This standard requires a federal district court to examine the evidence in the light most favorable to the State. *Id.* at 326 ("a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"). The state is not required "to rule out every hypothesis except that of guilt beyond a reasonable doubt[.]" *Id.* "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). Credibility determinations are reserved for the trier of fact and are "generally beyond the scope of habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 918 (6th Cir. 2012) (alteration omitted), *cert. denied sub. nom Moreland v. Robinson*, 134 S. Ct. 110 (2013). "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court

instead may do so only if the state court decision was objectively unreasonable." *Cavazos*, 132 S. Ct. at 4 (internal quotation marks omitted).

Because the Petition does not address the standards for evaluating habeas claims on the merits, it is unclear whether Reeves contends that the decision of the TCCA on Claim 1 was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or whether it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

Reeves has not established that the decision of the TCCA was contrary to *Jackson*. This is "a run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" and, therefore, it does "not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406.[8]

Reeves also has failed to satisfy his burden of demonstrating that the decision of the TCCA was an unreasonable application of *Jackson* or that it was based on an unreasonable determination of the facts. James L. Morris testified that he was the owner of M & M Plumbing and Electric, located at 28 Butler Street in the Bemis area of Jackson, Tennessee. (Trial Tr. 5, *State v. Reeves,* No. 10-317 (Madison Cty. Cir. Ct.), ECF No. 7-4.) He stated that various items of property were taken from his business on November 4-5, 2009. (*Id.*) The thefts were captured on security

---

[8]The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see also id.* at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's *application* of clearly established federal law was incorrect, the 'unreasonable application' clause becomes a nullity.").

cameras located at the business. (*Id.* at 6.) Photographs of the property were introduced, which established that it was necessary to drive up the driveway to get access to a yellow truck that was being repaired. (*See* Ex. 1, *State v. Reeves,* No. 10-317 (Madison Cty. Cir. Ct.), ECF No. 7-2 at PageID 107; *see also* Trial Tr. 10, *id.*, ECF No. 7-4 ("You have to come into the drive" to approach the barn.).) A "No Trespassing" sign was posted on the barn beside which the truck was parked. (Trial Tr. 9, *id.*, ECF No. 7-2; *see also* Ex. 1, *id.*, ECF No. 7-2 at PageID 108, 110.)

Morris compiled a list of the property that was taken from his business and attempted to determine the replacement value of each item. (Trial Tr. 13-17, *id.*, ECF No. 7-4; *see also* Trial Ex. 2, *id.*, ECF No. 7-2 at PageID 112.) The total replacement value of the stolen items, as estimated by him, was $3,890.

The jury also saw a video taken from the security cameras at Morris' business, which showed Reeves and Peterson loading various items into a blue pickup truck. (Trial Tr. 6, 20-22, *id.*, ECF No. 7-4; *see also* Trial Ex. 3, *id.*)[9] Morris testified that Reeves and Peterson did not have permission to be on his land or to take any items found thereon. (Trial Tr. 28, *id.*, ECF No. 7-4.) None of the missing items were recovered. (*Id.*)

On cross-examination, Morris testified that there was no sign containing the name of his business. (*Id.* at 31.) The property was not fenced. (*Id.*) The barn, on which the "Private Property" and "No Trespassing" signs were placed, was located behind a church. (*Id.* at 31-32.) There was no sign in the driveway or on the property boundary. (*Id.* at 32-33.) The cameras on the side and back of the barn audibly said, "No trespassing." (*Id.* at 34.)

---

[9]Exhibit 3 was manually filed with the Clerk of Court.

Some of the items taken were lying on the ground, and others were inside the truck. (*Id.* at 34-35.) Morris conceded that the area near the truck was grown up and there were woods nearby. (*Id.* at 35, 40.) He denied that he had planned to scrap the truck he had been working on. (*Id.* at 39-40.)

Peterson, testified that Reeves is her uncle. (*Id.* at 72, 73.) She stated that the charges against her were still pending. (*Id.* at 71-72.) She admitted that, on November 4-5, 2009, she went to "a street," but claimed that she "did not know that it was associated with M & M Plumbing whatsoever." (*Id.* at 71.) She went to the Bemis area on those dates because her uncle asked her to. (*Id.* at 72.) According to Peterson, Reeves asked to use her truck to get some scraps. (*Id.* at 73.) She owned a teal green 1994 Mazda B2300, which was a small pickup truck. (*Id.*) She asked Reeves whether he had a license, and he replied that he did not. (*Id.*) Peterson said they continued talking and Reeves told her the items he wanted were "[o]ver near where we used to go to church at West Bemis Baptist Church in the back." (*Id.* at 74.) She did not lend her truck to Reeves because he did not have a license. (*Id.*) He asked if she could take him to get the items, and she replied "What's in it for me?" (*Id.*) He agreed to split the proceeds with her. (*Id.* at 74-75.) This conversation took place the first day Peterson and Reeves went to the property. (*Id.* at 75.)

Peterson testified that she drove to the location. (*Id.* at 75, 76.) She recalled as follows:

> We didn't—whenever we got there, it wasn't near the M & M's. We were on the side of the street. I don't know the name of the street. Just all my life we've called it West Bemis. That's all I know is that we were on the end of the street on the side of the street near the end of the cross-way street.

(*Id.*) She further stated that "[w]e just got out and started loading things into the back of my truck on the side of the street." (*Id.*) Reeves showed her what to load into the truck. (*Id.* at 76-77.)

According to Peterson, the items were "[r]eally too heavy for the both of us."  (*Id.* at 77.)   She

remembered that "[w]e loaded some steel, arm length and some longer," "a few loads of steel" and

a steel table.  (*Id.*)   They made three trips to the site over two days and both loaded the items onto

the truck.  (*Id.* at 77-78.)   No one else was with them.  (*Id.* at 78.)

As for what she did with the items taken, Peterson testified that "I didn't know that we were

taking items."  (*Id.*)   At that point, the following exchange occurred:

> Q.      Okay.   When you say you didn't know that you were taking items,
> did you know that these items belonged to someone?
>
> A.      Actually, I didn't know.   I didn't have to question that or anything.
> He told me or asked me if I could take him.   It was no who do they belong to or
> what are we doing.   You know, if you are dealing with your family and they ask
> you to do something, you tend—it was no reason for me to question anything, so,
> no, I didn't.   I didn't question it.
>
> Q.      Mr. Reeves just asked you to go get these items and you just took
> him.   Is that correct or fair?
>
> A.      He asked me to take him there.   I had no idea that we were taking
> items.

(*Id.* at 79.)

Peterson recalled that she and Reeves took the stolen items to a recycling center.  (*Id.* at

78-79.)   She emphasized that "[w]e went to the recycle place down through town in the broad

daylight.   It was not dark.   We were not concealing anything.   People were passing by that we

know going to the recycle place."  (*Id.* at 79.)   The recycling centers were Hutcherson's and

Dudley's.  (*Id.* at 79-80.)   She identified the receipts she received for the items, which reflected

that the items were sold for a total of $215.   (*Id.* at 80-81, 82-83, 84-85; *see also* Trial Exs. 4-6,

*State v. Reeves,* No. 10-317 (Madison Cty. Cir. Ct.), ECF No. 7-2.)   Peterson received half the

proceeds.   (Trial Tr. 81, *id.*, ECF No. 7-4.)

Peterson admitted the receipts contained her signature and her thumb print. (*Id.* at 81-82.) She was required to show a driver's license when she delivered the load to Hutcherson Metals, but not at Dudley's. (*Id.* at 82, 86.) When asked whether she identified herself at Dudley's, she replied, "They already knew my name." (*Id.* at 87.) She testified that Reeves accompanied her each time she visited the location at Bemis and when she made deliveries to Hutcherson's and Dudley's. (*Id.*)

The prosecutor played the videotape from the security camera, which showed a pickup truck backing into the driveway of the property and Reeves and Peterson loading items into the truck. Peterson conceded that the truck in the video was hers and that the two people were herself and Reeves. (*Id.* at 91, 92.) In response to a question concerning where she parked her truck on the occasion depicted in the video, she offered the following testimony:

> I parked my truck on the street. That particular day, I think we just kind of backed up right into the ditch where it was at, that particular day.

> Q. You didn't pull into the front of the building?

> A. Yeah. We did go in the front.

(*Id.* at 92-93.) She could not remember whether the events shown on the video were the first, second or third visit to the property. (*Id.* at 92, 93.)

On cross-examination, Peterson acknowledged that she was dressed in coveralls and a hat when she got the items with Reeves. (*Id.* at 99.) She described it as a "winter suit," adding, "It was cold. It was November." (*Id.*) Defense counsel noted that Reeves was wearing "nice black

slacks and a white sleeveless shirt" and suggested that it was not cold outside. (*Id.*) Peterson replied, "It was cold to me. I'm thin. He's bigger." (*Id.*)[10]

Defense counsel asked Peterson why she testified that she never drove her truck onto the property and that she parked on the street. (*Id.*) In response, Peterson reiterated that "I drove my truck there." (*Id.*) At that point the following exchange occurred:

> Q.    But you told [the prosecutor] that you parked your truck on the street?
>
> A.    I did.
>
> Q.    You never drove it on the property?
>
> A.    No, I didn't. He did.
>
> Q.    So you said [the prosecutor] is the one that told you that you parked your truck on the street?
>
> A.    No. I'm not saying anything but that I parked my truck on the street. He backed my truck up and the reason why that was because it was a ditch. I initially said I can back my own truck up and he said, no, because I can run into the ditch. That's how he got up under the steering wheel.
>
> Q.    When we watched that video a little while ago, that's the second time I've seen that. It looked to me like your truck drove straight into that—
>
> A.    And I was initially driving.

(*Id.* at 100.)[11]

Peterson stated that the only reason her uncle gave about why he needed the truck was that "we were going to get some scraps." (*Id.*) She claimed he did not tell her why he was getting the

---

[10]The Court notes that counsel's description of Reeves' clothing is not supported by the video. Reeves appears to be wearing black exercise pants or work pants, not dress slacks. He is also wearing work boots and a white t-shirt with the sleeves removed.

[11]As defense counsel noted, the video depicted Peterson driving the truck into the driveway. Later, the truck backed out of the driveway, again with Peterson at the wheel.

scrap, adding, "He didn't tell me anything until after I was charged with it."   (*Id.* at 101.)   When

Peterson had been arrested and was being questioned by the police, she told them that someone

gave the items to her uncle.   (*Id.* at 102.)   After reviewing her statement to the police, given on

November 13, 2009, she conceded that Reeves told her some old white man had given him the

scrap metal.   (*Id.* at 103-04.)

> She concluded that
>
> I'm telling you, I never dreamed that this would get to this.   I was not just—did we
> get the stuff?   This stuff was in a ditch, man.   I'm telling you.   This don't—this
> was not good stuff.   This was scraps in a ditch.   It's no need to make out like this
> is something grand and as far as this man's business, it was nothing out there
> whatsoever that indicated that this was M & M's Plumbing.   I've never known it to
> be anything but West Bemis Baptist Church.

(*Id.* at 108.)   On redirect examination, Peterson conceded that neither she nor Reeves owned the

land on which the items were found.   (*Id.* at 109.)

The defense called Janet Fuller, an assistant kitchen manager at Outback Steak House, who

testified that Reeves was her boyfriend.   (*Id.* at 159.)   She related that, on November 4, 2009, she

was with Reeves at his parents' house when Peterson arrived.   (*Id.* at 160.)   Peterson asked

Reeves "would he go with her to look at some scrap that an old white man had given her."   (*Id.* at

161.)   The two left to look at the scrap and were gone for about an hour.   (*Id.*)   Peterson never

said anything different to Fuller about the incident.   (*Id.* at 162.)

On cross-examination, Fuller recalled that she did not go with Peterson and Reeves.   (*Id.*

at 163.)   According to the witness, "[t]he next day she took her son Josh out there to help her get a

load."   (*Id.*)

On redirect examination, Fuller testified that, on November 5, 2009, Peterson called her

home.   Later, Peterson picked Reeves up and the two departed.   (*Id.* at 164-65.)

Reeves has not satisfied his burden of demonstrating that the TCCA's conclusion that the evidence was sufficient to sustain his conviction for theft of property was contrary to *Jackson* or was based on an objectively unreasonable factual finding. The evidence established that Reeves and Peterson drove onto property owned by James Morris and, on several occasions, loaded Peterson's truck with items that did not belong to them. The items were taken from the property and delivered to local recycling centers, where they were sold for scrap. Peterson testified that Reeves told her an old white man had given him the metal items. Morris testified that he did not give Reeves and Peterson permission to be on his property or to take the items. At one point on the video, Reeves appears to be giving instructions to Peterson about the items to be taken, which contradicts his claim that he was acting at her direction. This evidence, viewed in the light most favorable to the state, is more than sufficient to sustain a conviction for theft of property.

As for the value of the property, Tennessee law permits a property owner to testify about the value of his property. Tenn. R. Evid. 401(b). Morris testified at length about the replacement cost of the stolen items. Defense counsel cross-examined Morris about his valuations and about whether the items were, in fact, scrap. The jury chose to accept Morris' testimony as to value and convicted Reeves of theft of property with a value of at least $1,000. Reeves has not established that the TCCA's decision on this aspect of Claim 1 was contrary to *Jackson* or was based on an objectively unreasonable factual finding.

These aspects of Claim 1 are without merit and are DISMISSED.

**B.    The Allegedly Defective Indictment (Claim 2)**

In Claim 2, Petitioner claims the indictment failed to charge all essential elements of the offense. (Pet. at 7, *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 1.)

Specifically, he complains that "[t]he indictment charging the petitioner with the offense of theft of property is void and defective, for failure to identify the name of the alleged victim, or the identity of the name of the alleged place of business." (*Id.* at 8; *see also* Mem. of Law in Supp. of Pet. at 5 (same), *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 1-1.) He argues that the defects in the indictment deprived the trial court of jurisdiction, couching this claim as a violation of the right to due process. (Mem. of Law in Supp. of Pet. at 1, 4-5, *id.,* ECF No. 1-1.)

In his answer, Respondent argues that Claim 2 is not cognizable in a § 2254 petition insofar as it relies on state law and procedure. The Warden also contends that Reeves failed to exhaust the constitutional issue in state court and, because there is no longer any means of doing so, it is barred by procedural default. (Answer at 11-12, *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 6.) These arguments are well taken.

Claim 2 is not cognizable in a federal habeas petition to the extent it argues that the indictment does not comply with Tennessee law. A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Error in the application of state law is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). Therefore, Claim 2 is not cognizable in a § 2254 proceeding insofar as it seeks relief for an alleged violation of Tennessee law.

Reeves did not exhaust a claim that any deficiencies in the indictment violated his right to due process. The sole issue raised on direct appeal was the sufficiency of the evidence. (*See* Br.

of Appellant at 2, *Reeves v. State,* No. W2009-00583-CCA-R3-CD (Tenn. Crim. App.), ECF No. 7-7 at PageID 416.)   Because there is no longer any means of exhausting this issue, it ordinarily would be barred by procedural default.

Although Reeves concedes that he did not exhaust Claim 2 (Pet. at 8, *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 1), he explains that this failure was due to the ineffective assistance of appellate counsel.   According to Petitioner, "[c]ounsel of record was handling the appeal process, until he eventually got disbarred, and failed to follow up with Petitioner's appeal, or even notify Petitioner of his right to proceed further, or that he had been disbarred."   (*Id.* at 6.)[12]   It is unclear precisely what Reeves contends his attorney did that was deficient.   Counsel filed a timely brief to the TCCA, but the application for leave to appeal to the Tennessee Supreme Court was dismissed as untimely.   (*See* Answer at 1-2, *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 6.)   He does not argue that his attorney rendered ineffective assistance on direct appeal by failing to include potentially meritorious issues in his brief.

Although the Supreme Court's decision in *Martinez v. Ryan* can serve to excuse a failure to exhaust a potentially meritorious ineffective assistance of trial counsel claim, *Martinez* cannot excuse Reeves' default of Claim 2 because it is not an ineffective assistance claim.   Any claim that appellate counsel rendered ineffective assistance is barred by procedural default.   *See*

---

[12]Contrary to Reeves' assertion, his trial counsel, Roger A. Staton, was not disbarred. According to the Tennessee Board of Professional Responsibility, a petition for discipline was filed against Staton on September 16, 2011.   The details of that petition are not public.   On June 5, 2012, the Tennessee Supreme Court issued an order transferring Staton to Disability Inactive Status.   *See In re Staton,* No. M2012-00266-SC-BPR-BP (Tenn. June 5, 2012), at http://tbpr.org/consumers/attorneysearch/AttorneyDetails.aspx?id=9797c156-fa60-de11-8b1d-00221913b451.

*Edwards*, 529 U.S. at 453 (an ineffective assistance claim asserted as the cause for a procedural default of another claim can itself be procedurally defaulted).

Finally, because there is no right to the assistance of counsel in state post-conviction proceedings, the attorney who represented Reeves at trial and on direct appeal had no duty to advise him about the availability of post-conviction relief. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions . . . and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal as of right, and no further."); *Bady v. Freeman,* No. 2:13-cv-02624-SHM-cgc (W.D. Tenn. July 30, 2014), ECF No. 11.)

Claim 2 is without merit and is DISMISSED.

## C.      The Deficient Affidavit of Complaint (Claim 3)

In Claim 3, Reeves argues that "[t]he affidavit of complaint was void and defective, and wherefore [sic] failed to establish a probable cause determination." (Mem. of Law in Supp. of Pet. at 2, *Reeves v. Lee,* No. 1:13-cv-01026-JDB-egb (W.D. Tenn.), ECF No. 1-1; *see also* Pet. at 10 (same), *id.*, ECF No. 1.) Petitioner insists that "[t]he affidavit of complaint was clearly void, because it was not signed by a judiciary magistrate or detached court clerk." (Pet. at 10, *id.*, ECF No. 1.) He couches this issue as a violation of the Fourth Amendment. (Mem. of Law in Supp. of Pet. at 6, *id.*, ECF No. 1-1.) Reeves is presumably arguing that he was arrested in contravention of the Fourth Amendment's prohibition on unreasonable seizures.

In his answer, Respondent argues that Claim 3 is not cognizable in a § 2254 petition insofar as it relies on state law and that Fourth Amendment claims are not cognizable in § 2254 petitions. (Answer at 12-13, *id.*, ECF No. 6.) The Warden also asserts that, even if Claim 3 were

cognizable, Reeves failed to exhaust the constitutional issue in state court and, because there is no longer any means of doing so, it is barred by procedural default. (*Id.* at 13.) These arguments are well taken. For the reasons discussed with respect to Claim 2, Petitioner cannot challenge his conviction on the ground that he was arrested in violation of state law.

The United States Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465, 489-95 (1976) makes clear that Fourth Amendment issues ordinarily may not be raised on collateral review where the defendant had a full and fair opportunity to litigate the issue prior to trial and on direct appeal. *See also United States v. Johnson*, 457 U.S. 537, 562 n.20 (1982) (After *Stone,* "the only cases raising Fourth Amendment challenges on collateral attack are those federal habeas corpus cases in which the State has failed to provide a state prisoner with an opportunity for full and fair litigation of his claim, analogous federal cases under 28 U.S.C. § 2255, and collateral challenges by state prisoners to their state convictions under postconviction relief statutes that continue to recognize Fourth Amendment claims."); *Boone v. United States*, No. 96-1398, 1996 WL 627760, at *2 (6th Cir. Oct. 29, 1996) (petitioner's Fourth Amendment claim "not cognizable on collateral review," citing *Stone*). Reeves makes no argument that there was no opportunity to litigate his Fourth Amendment issue in state court. He also does not allege that his trial counsel was ineffective in failing to file a motion raising that issue or that his appellate counsel was ineffective in failing to brief the issue.

Finally, Petitioner's cross-reference to the facts that the attorney who represented him at trial and on direct appeal failed to file a timely application for permission to appeal and failed to advise him of the availability of post-conviction relief are meritless for the reasons previously stated with respect to Claim 2. Claim 3 is without merit and is DISMISSED.

**V.        CONCLUSION**

For the reasons previously stated, the Court DISMISSES Claims 2 and 3.   The Court also DISMISSES Claim 1 except to the extent that it argues that the victim, James Morris, did not own the property in question.   Respondent has been directed to file a supplemental answer addressing that aspect of Claim 1 within twenty-eight days, and Petitioner has been given the opportunity to file a supplemental reply.   The Court will address the remainder of Claim 1 after the expiration of Reeves' time to file a supplemental reply.

IT IS SO ORDERED this 28th day of December 2015.


s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE